# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

CHRISTOPHER LEE HAAK,     )
    )
    Petitioner,     )
    )
v.     )     **Case No. 15-CV-0689-JED-PJC**
    )
RICK WHITTEN,[1]     )
    )
    Respondent.     )

## OPINION AND ORDER

Petitioner, Christopher Lee Haak, a state inmate appearing *pro se*, brings this 28 U.S.C. § 2254 petition for writ of habeas corpus (Doc. 1), to challenge the constitutional validity of the judgment and sentence entered against him in the District Court of Creek County (Bristow Division), Case No. CF-2011-257. In that case, a jury convicted Petitioner of first-degree burglary and knowingly concealing stolen property, and the trial court imposed consecutive 35-year and 5-year prison terms. Petitioner claims (1) he is being punished twice for the same crime in violation of his constitutional right to be free from double jeopardy, (2) he was deprived of a fair trial due to various trial errors and the cumulative effect of those errors, (3) the trial court abused its discretion by imposing consecutive, rather than concurrent sentences, and (4) he was denied his Sixth Amendment

---

[1] Petitioner is incarcerated at the James Crabtree Correctional Center (JCCC). The JCCC's current warden, Rick Whitten, is therefore substituted in place of Jason Bryant, as party respondent. *See* Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts.* The Clerk of Court shall note this substitution on the record.

right to the effective assistance of trial and appellate counsel. Respondent filed a response (Doc. 8) urging this Court to deny the petition and provided the state court record (Docs. 8, 9) necessary to adjudicate Petitioner's claims. Petitioner filed a reply (Doc. 10). For the reasons discussed below, the Court denies the habeas petition.

## *BACKGROUND*

Early in the morning on August 23, 2011, three or four men broke into the rural Depew home of Joey and Nicole Moore after Joey left for work. Doc. 9-2, Tr. Trial, vol. 1, at 104-12.[2] One of the men blindfolded Nicole and stood watch over her and two of the Moore's children while the other men searched for items in the house. *Id.* at 105-12. After the men left, Nicole removed the blindfold, surveyed the damage, and noticed that several items were missing, including her Hummer that had been parked outside. *Id.* at 112, 119-20. Because the men had either taken or disabled the Moore's phones and stolen her vehicle, Nicole walked down the road with her children and flagged down a passing driver so she could use the driver's phone to contact the Creek County Sheriff's office. *Id.* at 120-21.

Following an investigation, the State of Oklahoma filed a second amended information in the District Court of Creek County (Bristow Division), Case No. CF-2011-257, charging Petitioner with first-degree burglary, in violation of OKLA. STAT. tit. 21, § 1431 (Count 1); larceny of an automobile, in violation of OKLA. STAT. tit. 21, § 1720

---

[2] For consistency, the Court's record citations refer to the CM/ECF header page number located in the upper right-hand corner of each document.

(Count 2); knowingly concealing stolen property, in violation of OKLA. STAT. tit. 21, § 1713 (Count 3); and possession of a firearm after former conviction of a felony, in violation of OKLA. STAT. tit. 21, § 1283 (Count 4). Doc. 9-8, Orig. Rec., at 66-67. The State alleged that Petitioner committed the crimes in concert with Richard Robert Haak,[3] Caleb Wayne Bush, and Allen Lee Locust.[4] *Id.* at 66. In a supplement to the second amended information, the State further alleged that Petitioner committed these crimes after former conviction of two felonies. *Id.* at 68. Petitioner's case proceeded to a bifurcated jury trial in September 2012.[5] *Id.* at 87. The following facts were developed during the guilt stage of his trial.[6]

In mid to late August 2011, Locust told Petitioner and Richard that Locust's ex-girlfriend knew about a jeweler who lived in rural Depew and kept jewels and money in a

---

[3] Richard Robert Haak is Petitioner's brother. Doc. 9-2, Tr. Trial vol. 1, at 216-17. To avoid confusion, the Court refers to Petitioner's brother as Richard.

[4] The State initially charged Petitioner, in Case No. CF-2011-257, with first degree burglary, larceny of an automobile, and three counts of kidnapping, and, in Case No. CF-2011-259, with knowingly concealing stolen property. Doc. 8-1, at 9-10. The State charged Richard and Locust for their roles in the home invasion in Case Nos. CF-2011-262 and CF-2011-261, respectively. *Id.* Bush was first identified as an alleged participant in the crimes when the State filed the second amended information against Petitioner in Case No. CF-2011-257. Doc. 9-8, Orig. Rec., at 66; Doc. 8-1, at 9-10, 13 n.5.

[5] Richard and Locust were tried, convicted and sentenced for their roles in the home invasion before Petitioner's trial. Doc. 9-3, Tr. Trial vol. 2, at 45, 48, 75-77. Both men testified as defense witnesses at Petitioner's trial. *Id.* at 2. Bush testified as a witness for the State. Doc. 9-2, Tr. Trial vol. 1, at 2.

[6] Because the jury found Petitioner guilty, the Court recites the background facts, drawn from the trial transcripts, in the light most favorable to the State. In some instances, the Court includes facts favorable to Petitioner, but only to the extent those facts may be relevant to analyzing the prejudicial impact, if any, of the alleged trial errors.

home safe. Doc. 9-2, Tr. Trial vol. 1, at 143, 173, 197; Doc. 9-3, Tr. Trial vol. 2, at 6-7, 48-49. The three men discussed breaking into the jeweler's home. Doc. 9-2, at 143, 173, 197; Doc. 9-3, at 6-7, 48-49. Three people overheard those discussions: (1) Jessica Campbell, Richard's girlfriend, Doc. 9-2, at 170-73, (2) Robert Hamilton, Richard's teenage son, *id.* at 193-97, and (3) Caleb Wayne Bush, a man who had recently met Richard and agreed to help him move from Bristow to Campbell's house in Depew, *id.* at 140-43.

On the evening of August 22, 2011, Petitioner, Bush and Locust were helping Richard move his furniture into Ms. Campbell's house. Doc. 9-2, Tr. Trial vol. 1, at 143-45, 173-75. Campbell and Hamilton were also at Campbell's house. *Id.* at 144, 174. Sometime before 10:00 p.m., Petitioner, Richard, Locust and Bush left in Richard's white car. *Id.* at 144-46; Doc. 9-3, Tr. Trial vol. 2, at 50. Bush drove the car. *Id.* Petitioner, Richard and Locust were dressed in dark or black clothing, and Petitioner carried a black bag. Doc. 9-2, at 146, 198-99; Doc. 9-3, at 7, 49. Campbell thought the men were going to Bristow to retrieve more of Richard's belongings. Doc. 9-2, at 174-75.

As they drove, Locust told Bush to drop the men off on a dirt road between Depew and Bristow. *Id.* at 147. The men told Bush to have his phone ready so he could return later to pick them up. *Id.* After dropping the men off, Bush "scraped up some change" and bought gas at a Kum and Go in Bristow.[7] *Id.* at 147-48. Bush then drove back to

---

[7] At trial, Bush identified himself in a still photograph taken from the Kum and Go surveillance camera. Doc. 9-2, Tr. Trial vol. 1, at 148-49. The time and date stamp on the photograph placed Bush at the Kum and Go at 10:26 p.m. on August 22, 2011. *Id.*; *see also* Doc. 9-5, at 4 (State's Exhibit 31-A).

Campbell's house, alone, and waited for a couple of hours but did not receive any phone calls. Doc. 9-2, at 149-50. Campbell woke up sometime around midnight, walked to the bathroom, and saw Bush sitting on the couch in Campbell's living room couch. *Id.* at 175. Campbell did not see Petitioner at that time.[8] *Id.* at 175, 189-90. Hamilton went to bed around 1:00 a.m. *Id.* at 200. Hamilton saw Bush return to the Campbell's house before he went to bed, but did not see Petitioner. *Id.* At some point, Bush drove Campbell's purple Chrysler to the drop-off location, honked the horn and waited for about 15 minutes. *Id.* at 150-51. Seeing no one, he returned to Campbell's house. *Id.*

Meanwhile, Richard, Locust and Petitioner approached the Moore's house,[9] waited until they saw a vehicle leave the driveway, and broke into the Moore's home through the

---

[8] On cross-examination, Campbell testified that Petitioner and Bush both returned to her house "several times" after all four men left in Richard's car. Doc. 9-2, Tr. Trial vol. 1, at 189-90. But she also testified she was asleep and she did not know "for sure" whether Petitioner stayed at her house with Bush. *Id.* She also admitted her preliminary hearing testimony was inconsistent with her trial testimony that she never saw Petitioner return to the house after the four men left. *Id.*

[9] Richard and Locust testified at trial that they had not planned to break into the Moore's home; rather, despite planning the break in for "[a]bout two, three weeks," they mistakenly thought the Moore's home belonged to their intended target—the jeweler with a safe full of money and jewelry. Doc. 9-3, Tr. Trial vol. 2, at 14, 19, 48-49.

front door.[10]  Doc. 9-3, Tr. Trial vol. 2, at 8-9, 21-24, 50-51.

Sometime after 4:30 a.m., when her husband left for work, Nicole Moore "awoke to a strange feeling that something wasn't right or someone was there . . . ." Doc. 9-2, Tr. Trial vol. 1, at 105.  When she opened her eyes, Nicole saw a silhouette of a person next to her bed.  *Id.* at 105-06.  She jumped up and screamed but a man "immediately blindfolded" her, covered her mouth, and told her to "be quiet."  *Id.* at 105, 107.  She then heard "multiple voices" that she interpreted as "three to four" male voices.  *Id.* at 108.  The men asked Nicole where they could find the safe, jewelry and money.  *Id.* at 109.  Nicole repeatedly told the men that there was no safe in the home.  *Id.*  Two of Moore's children woke up, ran into her room, and jumped on her bed.[11]  *Id.*  The man standing by Nicole's bed told the children to cover their eyes and placed a cover over them.  *Id.*  When the men asked Nicole about two specific items—a .22 caliber rifle and a Toshiba laptop—she told the men

---

[10] Richard and Locust both testified that Petitioner participated in planning the home invasion and joined them in approaching the Moore's house but both men also testified that Petitioner ran off after the three men heard barking dogs and did not enter into the Moore's house or otherwise participate in the home invasion.  Doc. 9-3, Tr. Trial vol. 2, at 6-9, 11-12, 14-24, 26, 48-51, 56-63.  Both also testified that after they entered the Moore's home, they did not see Petitioner again until they returned to Campbell's house where Petitioner, Bush and Hamilton helped them unload stolen items from the Hummer.  *Id.* at 26-30, 53-64.

[11] After the men left, Nicole found her third child safe in bed; he slept through the home invasion.  Doc. 9-2, Tr. Trial vol. 1, at 112-13, 120.

where to find those items, hoping the men would hurry up and leave.[12]  *Id.* at 110.  Nicole heard items crashing to the floor throughout the house.  *Id.* at 111-12.  At one point, she heard a voice say, "hurry up, Chris.  Hurry up, Chris," and "Hurry up, Tyrone."  *Id.* at 112. Nicole remained blindfolded throughout the incident.  *Id.*

Back at Campbell's house, Bush decided to drive Campbell's gold Malibu to the drop-off location.  Doc. 9-2, Tr. Trial vol. 1, at 151.  This time, he saw Petitioner in the middle of the road.  *Id.*  Petitioner flagged Bush down and told him "to scoot over" because Petitioner "had to get back to where they were."  *Id.* at 152.  Bush dozed off while Petitioner drove.  *Id.*  When Bush awoke, Petitioner was gone.  *Id.*  Bush saw a house about 150 yards away and walked toward it.  *Id.* at 152-53.  When he got close to the house, he saw Richard and Locust "at the door."  *Id.* at 153.  They told him to hurry up and get inside, so he entered the house through the back door, near the laundry room.  *Id.*  Bush saw that "[t]he house had been totally trashed" with "stuff thrown everywhere."  *Id.*  He saw "a pile of stuff behind the couch" in the living room and "a silhouette of somebody covered up in a blanket" in a bedroom.  *Id.* at 153-54.  Bush saw Petitioner, Richard and Locust "going through drawers and dressers and still trying to find stuff to take."  *Id.* at 155.  He heard Richard and Locust say, "[h]urry up, Chris.  Hurry up.  We've got to go."  *Id.*  After a few minutes, Bush told the men that what they were doing was "wrong," and walked out the

---

[12] Nicole testified the rifle was hidden in the closet and she knew the men found the gun because she "could hear them unzipping the gun case it was in."  Doc. 9-2, Tr. Trial vol. 1, at 110.  She also testified that they asked about the laptop because "[t]hey stumbled across the box that [the laptop] came in in [her] closet when they located the .22 rifle."  *Id.* at 130.

front door. Doc. 9-2, at 155. As he walked toward the Malibu, Bush saw Richard and Locust drive by in a Hummer. *Id.* at 156. Petitioner, who was holding a Toshiba laptop, told Bush to get into the Malibu and drove back to Campbell's house. *Id.* at 156-57.

When the four men arrived at Campbell's house, they unloaded items from the Hummer. Doc. 9-2, Tr. Trial vol. 1, at 157-58, 176; Doc. 9-3, Tr. Trial vol. 2, at 29-30. Richard told Campbell to wake Hamilton so that Hamilton could help move items into the house. Doc. 9-2, at 157-58, 176; Doc. 9-3, at 30. Hamilton helped one of the men carry a large television into the house. Doc. 9-2, at 176, 204. Campbell and Hamilton both saw Petitioner holding onto and using a Toshiba laptop. *Id.* at 177-78, 213-14. After all the items were unloaded, Richard and Locust drove away in the Hummer. *Id.* at 159, 179; Doc. 9-3, at 13-14, 39. Shortly thereafter, Petitioner received a phone call from Richard and Locust. Doc. 9-2, at 159. Petitioner and Bush then left in Richard's car. *Id.* at 159, 179, 206. Following Petitioner's directions, Bush drove for about ten miles and found Richard and Locust. *Id.* at 160. Someone set the Hummer on fire, and all four men "got into [Richard's car] and Richard drove back" to Campbell's house. *Id.* at 160-61, 179-80; Doc. 9-3, at 39-40.[13]

When law enforcement officers arrived at the Moore's home to investigate the break-in, Nicole identified several items that were missing, including: a 72-inch flat-screen television, a Toshiba laptop, several tools, and a .22 caliber rifle. Doc. 9-2, Tr. Trial vol.

---

[13] Richard and Locust both testified that Petitioner stayed at Campbell's house when Richard, Locust and Bush disposed of the Hummer. Doc. 9-3, Tr. Trial vol. 2, at 39-40, 54-55.

1, at 121-22. She also reported that her Hummer, which contained a checkbook and cash, had been stolen. *Id.* at 122. A few hours later, officers found the Hummer in a wooded area of Creek County. *Id.* at 121-24, 235-36. The Hummer had been set on fire; only the steel frame remained intact. *Id.*; *see also* Doc. 9-5, at 5-6 (State's Exhibits 31 & 32- photographs of Hummer).

After receiving a tip about some of the stolen property, law enforcement officers executed a search warrant at Campbell's house. Doc. 9-2, Tr. Trial vol. 1, at 170, 181-84, 231-38. There, officers found the Moore's television and several hand tools. *Id.* at 231-37. They found more tools in Richard's car which was parked outside Campbell's house. *Id.* at 237. Five days after the break-in, Petitioner called the Creek County Sheriff's office and met with deputies to turn over the Moore's Toshiba laptop. *Id.* at 242-43. He reported that Richard gave him the laptop and that it was from the home invasion. *Id.* at 243.

At the end of the guilt stage, the jury found Petitioner guilty of first-degree burglary and knowingly concealing stolen property. Doc. 9-3, Tr. Trial vol. 2, at 104-05. The jury found him not guilty as to the charge of larceny of an automobile.[14] *Id.* at 104. At the end of the penalty stage, the jury found Petitioner had two prior felony convictions, recommended a 35-year prison term for the burglary conviction, and recommended a 5-year prison term for the concealment of property conviction. *Id.* at 116-18. The trial court sentenced Petitioner accordingly, denied Petitioner's request for concurrent sentences, and

---

[14] The trial court sustained Petitioner's demurrer on the firearm possession charge before the case went to the jury. Doc. 9-8, Orig. Rec., at 98, 140.

ordered the sentences to be served consecutively. Doc. 9-6, Tr. Sent. Hr'g, at 2-4.

Petitioner perfected a timely direct appeal, raising six propositions of error. Doc. 8-1, Pet'r App. Br., at 2-3. By unpublished summary opinion, filed December 5, 2013, the Oklahoma Court of Criminal Appeals (OCCA), rejected each proposition on the merits and affirmed Petitioner's judgment and sentence. Doc. 8-3, *Haak v. State*, No. F-2012-1028 (Okla. Crim. App. 2013) (unpublished) (hereafter, "OCCA Op."), at 1-10. Petitioner did not file a petition for writ of certiorari in the United States Supreme Court. Doc. 1, at 3.

Petitioner filed an application for postconviction relief in state district court on February 18, 2015, alleging his Sixth Amendment rights were violated because both trial counsel and appellate counsel were ineffective. Doc. 8-4, Pet'r PC App, at 4-6. On March 26, 2015, the state district court filed partial postconviction findings. Doc. 8-6, at 1. The court (1) denied relief as to Petitioner's ineffective-assistance-of-appellate counsel claim, (2) denied relief as to all but one part of his ineffective-assistance-of-trial-counsel claim, and (3) granted Petitioner's request for an evidentiary hearing to determine whether trial counsel refused to allow Petitioner to testify at trial. *Id.* at 1-4. On June 1, 2015, following the evidentiary hearing, the state district court filed final postconviction findings and denied relief on the remaining part of Petitioner's ineffective-assistance-of-trial-counsel claim. *Id.* at 6-9. By order filed November 18, 2015, the OCCA affirmed the denial of Petitioner's application for postconviction relief. Doc. 8-8, *Haak v. State*, No. PC-2015-593 (Okla. Crim. App. 2015) (unpublished) (hereafter "OCCA PC Order"), at 1-5.

Petitioner filed the instant federal habeas petition (Doc. 1) on December 4, 2015.

## DISCUSSION

Petitioner seeks federal habeas relief on the same grounds he presented to the OCCA through his direct and postconviction appeals. He claims his continued custody violates federal law because (1) his convictions for first-degree burglary and knowingly concealing stolen property violate "constitutional and statutory protections against double punishment and double jeopardy," (2) judicial bias deprived him of a fair trial, (3) the trial judge violated his due process rights by defining reasonable doubt during voir dire, (4) prosecutorial misconduct deprived him of a fair trial, (5) the trial court abused its discretion by imposing consecutive sentences, (6) the cumulative effect of trial errors deprived him of a fair trial, (7) trial counsel was ineffective, and (8) appellate counsel was ineffective. Doc. 1, at 5, 7-8, 10, 12-15.

## I.    Timeliness and exhaustion

In most cases, a state prisoner must file a federal habeas petition within one year of the date on which his state judgment became final. 28 U.S.C. § 2244(d)(1)(A). In addition, before seeking federal habeas relief, a state prisoner must exhaust available state-court remedies, *id.* § 2254(b)(1)(A), by "fairly present[ing] the substance of his federal claim[s] to state courts," *Hawkins v. Mullin*, 291 F.3d 658, 668 (10th Cir. 2002).

Respondent concedes, and the Court finds, that Petitioner timely filed his habeas petition and exhausted each of his claims by presenting them to the OCCA through direct and postconviction appeals. Doc. 8, at 2. Respondent contends, however, (1) that Claim Five alleges only an error of state law and, therefore, is not a cognizable habeas claim, and

(2) that 28 U.S.C. § 2254(d) bars relief as to the remaining claims.[15]  *Id.* at 8-36.

## II.    Cognizability

In his fifth claim, Petitioner alleges that the trial court abused its discretion and violated his right to due process when the court imposed consecutive sentences based on the court's "policy" of "always impos[ing] the jury's verdicts consecutive" when a case goes to trial.  Doc. 1, at 12.

The OCCA rejected this claim.  Doc. 8-3, OCCA Op., at 8-9.  The OCCA found that Petitioner failed to establish that the trial court's refusal to grant his request for concurrent sentences was "based upon a policy of denying concurrent sentences to defendants that go to jury trial."  *Id.* at 9.  The OCCA further found that the trial court did not abuse its discretion in failing to impose concurrent sentences because Petitioner "did not show any positive basis for imposition of concurrent sentences."  *Id.* Finally, the OCCA found that Petitioner's "sentences, both individually and in their totality, are within the applicable statutory range and when considered under all the facts and circumstances of the case, are not so excessive as to shock the conscience of the [c]ourt."  *Id.*

Petitioner contends the OCCA's decision on this claim is "clearly flawed," "clearly contrary to state and federal law and based on a[n] unreasonable determination of the facts."  Doc. 1, at 12; Doc. 10, at 4.  The Court, however, agrees with Respondent that Claim Five does not present a cognizable habeas claim.  *See* Doc. 8, at 31-33.  A federal

---

[15] Respondent argues that part of Claim Eight is procedurally barred, and the remainder of Claim Eight is barred under § 2254(d).  The Court briefly addresses this argument in analyzing Claim Eight.  *See infra* n.13.

court may grant habeas relief to a state prisoner only on the ground that the prisoner's conviction or sentence was obtained or is being enforced "in violation of the Constitution, laws, or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts"). As a general rule, matters pertaining to sentencing are state law issues. *Dennis v. Poppel*, 222 F.3d 1245, 1258 (10th Cir. 2000). As a result, a federal habeas court's "review of a sentence [generally] ends once [the court] determine[s] the sentence is within the limitation set by statute." *Id.*

Petitioner was convicted of first-degree burglary and knowingly concealing stolen property, both after former conviction of two or more felonies. Doc. 9-3, Tr. Trial vol. 2, at 116-18. Petitioner's sentences for those crimes, a 35-year prison term and a 5-year prison term, fall within the range of permissible punishment for an offender with two prior felony convictions. Doc. 9-8, Tr. Sent. Hr'g, at 2-3; *see* OKLA. STAT. tit. 21, §§ 51.1(C), 1436, 1713. Because Oklahoma law authorizes the sentences Petitioner received, he fails to state a cognizable habeas claim.

Moreover, to the extent his claim focuses solely on the imposition of consecutive sentences, that too is a question of state law. *Dennis*, 222 F.3d at 1258; *Handley v. Page*, 398 F.2d 351, 352 (10th Cir. 1968). Oklahoma law provides that a trial court may impose consecutive sentences "[i]f the defendant has been convicted of two or more offenses," but retains discretion to impose concurrent sentences. OKLA. STAT. tit. 22, § 976. Ordinarily, federal courts will not disturb a state court's discretionary decision to impose concurrent

or consecutive sentences.  *Handley*, 398 F.2d at 352.  Because Claim Five fails to state a cognizable habeas claim, the Court denies relief.

## III.  Claims adjudicated on the merits in state court proceedings

Petitioner's remaining claims are cognizable habeas claims, and the OCCA rejected each claim on the merits.  As a result, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits this Court's review of those claims.  Under the AEDPA, when a state court adjudicates the merits of a state prisoner's federal claims, a federal court may not grant habeas relief unless the prisoner shows that the state court's adjudication of those claims either (1) "resulted in a decision that was contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); (2) "resulted in a decision that . . . involved an unreasonable application of clearly established Federal law," *id.*;[16] or (3) "resulted in a decision that was based on an unreasonable determination of the facts" in light of the record presented to the state court, *id.* § 2254(d)(2); *see Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (*per curiam*) (reiterating that "[i]f the state courts adjudicate the prisoner's federal claim 'on the merits,' § 2254(d), then AEDPA mandates deferential, rather than *de novo*, review, prohibiting federal courts from granting habeas relief" unless the prisoner makes the requisite showings under 2254(d)).

---

[16] For purposes of § 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 405, 412 (2000) (*Terry Williams*).

When a petitioner alleges the state court's decision on a federal claim rests on a legal error, § 2254(d)(1) applies and the federal court's first task is to identify the Supreme Court precedent governing that claim. *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). "The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Id.* If clearly established federal law governs the claim, the federal court must "ask whether the state court decision is either contrary to or an unreasonable application of such law." *Id.* "A state-court decision is only contrary to clearly established federal law if it 'arrives at a conclusion opposite to that reached by' the Supreme Court, or 'decides a case differently' than the [Supreme] Court on a 'set of materially indistinguishable facts.'" *Wood v. Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting *Terry Williams*, 529 U.S. at 412-13). Critically, "[s]o long as the state-court's reasoning and result are not contrary to the [Supreme] Court's specific holdings, § 2254(d)(1) prohibits [federal courts] from granting relief." *Id.*

A state-court decision involves an unreasonable application of clearly established federal law "if the decision 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Fairchild v. Trammell*, 784 F.3d 702, 711 (10th Cir. 2015) (quoting *Terry Williams*, 529 U.S. at 407-08). An unreasonable application of clearly established federal law may also arise "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Terry Williams*, 529 U.S. at 407. Nonetheless, in either situation, an unreasonable application must be "objectively unreasonable", *id.* at 409, "not merely

wrong," *White v. Woodall*, 572 U.S. 415, 419 (2014); *see also Wood*, 907 F.3d at 1289

("[A] state court's application of federal law is only unreasonable if 'all fairminded jurists

would agree the state court decision was incorrect.'" (quoting *Frost v. Pryor*, 749 F.3d

1212, 1225 (10th Cir. 2014))).

Finally, "when a federal habeas petitioner challenges the factual basis for a prior

state-court decision rejecting a claim," the federal court must determine, under

§ 2254(d)(2), whether the state-court decision rests on "an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." *Burt v. Titlow*,

571 U.S. 12, 18 (2013).[17] "[A] state-court decision unreasonably determines the facts if

the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings,

and the misapprehension goes to a material factual issue that is central to petitioner's

claim.'" *Wood*, 907 F.3d at 1289 (alterations in original) (quoting *Byrd v. Workman*, 645

F.3d 1159, 1170-72 (10th Cir. 2011)).

Ultimately, § 2254(d) requires federal habeas courts to give state court decisions the

"benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002), with respect to federal

claims "already rejected in state proceedings," *Harrington v. Richter*, 562 U.S. 86, 102

(2011). Section 2254(d)'s standards are meant to be imposing, because "habeas corpus is

---

[17] The AEDPA also requires a federal court to presume the correctness of a state court's factual findings unless the petitioner rebuts the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Supreme Court has "not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)." *Burt*, 571 U.S. at 18. Likewise, the United States Court of Appeals for the Tenth Circuit has stated that the "'interplay between § 2254(d)(2) and § 2254(e)(1) is an open question' in this circuit." *Wood*, 907 F.3d at 1289 n.9. The Court finds it unnecessary, under the facts of this case to divine an answer to this riddle.

a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

With these standards in mind, the Court turns to Petitioner's remaining claims. [18]

## A.   Claim One:  Double Jeopardy

Petitioner claims that his convictions for first-degree burglary and knowingly concealing stolen property violate Oklahoma's statutory prohibition against multiple punishments, as found in OKLA. STAT. tit. 21, § 11A, and violate his federal and state constitutional rights to be free from double jeopardy, as found in the Fifth Amendment to the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma constitution. Doc. 1, at 5; Doc. 10, at 1-2.

Petitioner raised this claim on direct appeal, and the OCCA rejected it.  Doc. 8-3, OCCA Op., at 2-4.  First, the OCCA found that Petitioner's crimes did not arise out of the same act and, therefore, did not violate the statutory prohibition against multiple punishments.  *Id.* at 3.  Second, applying the legal principles from *Blockburger v. United States*, 284 U.S. 299 (1932), the OCCA found that Petitioner's crimes "were separate and distinct offenses each requiring proof of an additional fact," and, therefore, did not violate "constitutional prohibitions against double jeopardy.  *Id.* at 3-4.

---

[18] Petitioner asserts that the OCCA failed to rule on the merits of Claims One through Four, Seven and Eight.  Doc. 1, at 5, 7, 8, 10, 14-15.  But the record clearly contradicts his assertions.  Doc. 8-3, OCCA Op, at 2-10; Doc. 8-8, OCCA PC Order, at 2-5.  Thus, each of these claims is subject to review under § 2254(d), and the Court will not further address Petitioner's unsupported assertions regarding the OCCA's alleged failure to rule on his claims.

Petitioner contends the OCCA's ruling is "clearly contrary to state and federal law and based on a[n] unreasonable determination of the facts." Doc. 1, at 5. He further contends the OCCA "failed to properly apply" *Blockburger*. Doc. 10, at 2. For two reasons, the Court disagrees and denies habeas relief on this claim. First, to the extent Petitioner alleges a violation of Oklahoma's statutory or constitutional prohibitions against multiple punishments, he alleges only errors of state law. *See Wilson*, 562 U.S. at 5; *Spradling v. Addison*, 367 F. App'x 938, 941 (10th Cir. 2010) (unpublished)[19] (explaining that petitioner's claim arising under OKLA. STAT. tit. 21, § 11 presented an issue of state law not cognizable on habeas review).

Second, to the extent Petitioner alleges a violation of his Fifth Amendment right to be free from double jeopardy, § 2254(d) bars relief. The Double Jeopardy Clause protects against multiple criminal punishments for the same offense imposed in a single proceeding. *See Jones v. Thomas*, 491 U.S. 376, 380-81 (1989) (discussing scope of Fifth Amendment's double jeopardy protections). But this protection "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.* (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)). Under the *Blockburger* test, the reviewing court "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment." *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *Blockburger*, 284 U.S. at 304).

The question in this case is whether first-degree burglary and knowingly concealing

---

[19] The Court cites this decision, and other unpublished decisions herein, as persuasive but not precedential authority. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

stolen property, as defined under Oklahoma law, are the same offense. A comparison of the elements of these crimes supports the OCCA's determination that they are not the same offense. To prove a defendant committed the crime of first-degree burglary, the State must establish that the defendant (1) broke into and (2) entered (3) the dwelling (4) of another (5) in which a human being was present (6) with the intent to steal or commit a crime therein. OKLA. STAT. tit. 21, § 1431; Oklahoma Uniform Jury Instruction-Criminal (OUJI-CR) (2d) No. 5-12. To prove a defendant committed the crime of knowingly concealing stolen property, the State must establish that the defendant (1) concealed or withheld (2) stolen personal property (3) from the owner, (4) knowing or believing the property had been stolen, (5) with the intent to permanently deprive the owner of that property. OKLA. STAT. tit. 21, § 1713; OUJI-CR (2d) No. 5-113. These two crimes share no identical elements. Thus, as the OCCA concluded, Petitioner's convictions for both crimes did not violate his right to be free from multiple punishments for the same offense. Because that conclusion is consistent with guiding Supreme Court precedent, objectively reasonable, and not based on an unreasonable determination of the facts, the Court denies habeas relief on Claim One.

**B.     Claim Two:  Judicial Bias**

Next, Petitioner claims that judicial bias deprived him of his constitutional rights to due process and a fair trial. Doc. 1, at 7. He alleges that the trial court actively participated in assisting the prosecution (1) "by bringing to light potential weaknesses in the State's case," and (2) "by participating in the examination of witnesses to obtain favorable information for the admission of a critical State's exhibit." *Id.*

The OCCA rejected this claim on direct appeal. Doc. 8-3, OCCA Op., at 4-5. Because Petitioner did not allege judicial bias in the trial court or seek recusal, the OCCA reviewed Petitioner's claim for plain error. *Id.* at 4. The OCCA determined that Petitioner failed to show "that his trial was unfairly conducted or that the trial judge showed actual bias or acted with impermissible partiality." *Id.* The OCCA rejected Petitioner's argument that the trial judge "actively participate[d] in the trial as a party," finding that the trial judge instead "maintained [his] duty to see . . . that both sides have a fair trial." *Id.* The OCCA acknowledged that the trial judge "asked questions of a State's witness while determining [Petitioner's] objection to the admission of an exhibit." *Id.* at 4-5. But the OCCA found that "the judge remained neutral and did not communicate any personal opinion regarding either guilt or innocence or witness credibility to the jury at any point during the trial." *Id.* at 5. The OCCA thus concluded that Petitioner failed to show "an actual error," let alone a plain error. *Id.*

Petitioner contends the OCCA's decision is "clearly contrary to state and federal law and was clearly based on a[n] unreasonable determination of the facts." Doc. 1, at 7. Further, he contends the OCCA's decision is "in conflict with" *Tumey v. State of Ohio*, 273 U.S. 510 (1927) and *Arizona v. Fulminante*, 499 U.S. 279 (1991).[20] Again, the Court finds

---

[20] *Tumey* stands for the general proposition that a due process violation may occur if it has "a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." 273 U.S. at 523. Petitioner's reliance on *Fulminante* is less clear. In that case, the Supreme Court held, in a fractured opinion, that the constitutional harmless-error rule applies to the admission of a criminal defendant's coerced confession. *Fulminante*, 499 U.S. at 295. In so holding, the Supreme Court cited *Tumey* and reiterated that being tried by a biased judge results in a structural defect that is not subject to the harmless-error rule. *Id.* at 1264-65. Presumably, Petitioner cites *Fulminante* for this proposition.

that § 2254(d) bars relief. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "Due process guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *Murchison*, 349 U.S. at 136).[21] In assessing an allegation of judicial bias, the relevant question is "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias."'" *Id.* (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)). Under this objective standard, a petitioner can demonstrate bias by showing either "actual bias" or "that circumstances were such that an appearance of bias created a conclusive presumption of actual bias." *Fero v. Kirby*, 39 F.3d 1462, 1478 (10th Cir. 1994). Nonetheless, the Supreme Court has recognized that "most matters relating to judicial disqualification [do] not rise to a constitutional level." *Caperton*, 556 U.S. at 876 (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948)).

As he did in state court, Petitioner claims the trial judge demonstrated judicial bias in two instances.

### 1. Evidence of "breaking"

First, Petitioner contends the trial judge "acted as a second-chair prosecutor" by

---

[21] The OCCA did not have the benefit of the Supreme Court's decision in *Williams* when the OCCA affirmed Petitioner's convictions in 2013. But the Court finds *Williams* helpful to the extent it explains Supreme Court precedent as it stood in 2013.

telling the prosecutor that evidence on the "breaking" element of burglary was "weak" and suggesting that the prosecutor ask more questions of the homeowner, Nicole Moore, to establish that element. Doc. 1, at 7; *see* Doc. 8-1, Pet'r App. Br., at 21.

On this point, the trial transcript reflects that before the trial judge intervened, Moore identified State's Exhibit 9 as a photograph of her front door latch lying on the floor. Doc. 9-2, Tr. Trial vol. 1, at 116; *see also* Doc. 9-4, at 10 (State's Exhibit 9). Moore testified that the latch was attached to the front door before the home invasion. Doc. 9-2, at 116. After several additional questions, the prosecutor stated he was through with his direct examination of Moore, and the trial court asked the prosecutor and defense counsel to approach for a bench conference. *Id.* at 131. The following colloquy occurred outside the hearing of the jury:

| | |
|---|---|
| THE COURT: | I don't want to have to reopen the evidence and the breaking is exceedingly weak of breaking in. Now, you've identified a latch that was on the floor but we haven't identified the condition of the door before this incident. |
| [Prosecutor]: | I thought—okay. I'll go over that. |
| THE COURT: | Okay. I just don't want to have to reopen. |

*Id.* at 131-32. The prosecutor then asked additional questions of Moore, establishing that the front door "was kicked in," "broken," and rendered "not fixable" as a result of the home invasion, and that the front door had been locked before the home invasion. *Id.* at 132-33. The prosecutor ended his direct examination of Moore after eliciting this additional testimony. *Id.* at 133.

On this record, the Court finds nothing objectively unreasonable about the OCCA's

decision that Petitioner failed to demonstrate judicial bias as to the first part of Claim Two. Neither the trial court's characterization of the evidence regarding the "breaking" element as "exceedingly weak" nor its suggestion that the prosecutor ask more questions support Petitioner's judicial-bias claim. Notably, the trial court made these comments outside the hearing of the jury. And, as demonstrated above, the trial court's intervention didn't significantly, or even slightly, tip the scales in the prosecution's favor. Before the trial court asked counsel to approach the bench, Moore testified that the latch she found lying on the floor had been on the front door before the home invasion. Doc. 9-2, Tr. Trial vol. 1, at 116. After the bench conference, the prosecutor elicited further testimony from Moore that the latch shown lying on the floor in State's Exhibit 9 ended up on the floor after the door was "kicked in" and "broken" without her permission. *Id.* at 132-33. Even absent the trial court's intervention, it would have been reasonable for the jury to infer from Moore's initial testimony that the men who entered the Moore's home broke in through the front door. For these reasons, the trial court's arguably unnecessary intervention does not demonstrate apparent or actual judicial bias.

### 2. Admission of State's Exhibit 34

Second, Petitioner complains that the trial judge aided the prosecution "by participating in the examination of" Jessica Campbell "to obtain favorable information for the admission of" State's Exhibit 34, which Petitioner characterizes as a "critical" exhibit. Doc. 1, at 7; *see also* Doc. 8-1, Pet'r App. Br., at 22-23.

During direct examination, Campbell testified (1) that she initially told law enforcement officers that she "didn't know anything" about the stolen property found in

her house, (2) that she later provided a second, truthful statement to law enforcement officers, and (3) that she was telling the truth at trial. Doc. 9-2, Tr. Trial vol. 1, at 184-85. Campbell then testified that sometime after Petitioner's arrest, she received a letter from Petitioner asking her to change her testimony. *Id.* at 185. The prosecutor asked Campbell to identify State's Exhibit 34. *Id.* Campbell identified the exhibit as a letter, addressed "To Jessica," and signed by Petitioner. *Id.* She further testified that she received the letter from Petitioner's mother, LaDonna Muir. *Id.* at 186. Finally, Campbell described the letter as "[t]elling [Campbell] to lie on the stand so [Petitioner] could win his case." *Id.*

After eliciting this testimony, the prosecutor offered State's Exhibit 34 into evidence. Doc. 9-2, Tr. Trial vol. 1, at 186. Defense counsel stated, "Your Honor, I object to that one." *Id.* The trial court then stated, "Okay. On what grounds? Let me see it for a second." *Id.* Without waiting for defense counsel to clarify the basis of her objection, the trial court proceeded to ask Campbell (1) whether she recognized the letter as Petitioner's handwriting, (2) whether she had previously seen his handwriting, and (3) whether the letter reflected "the way that [Petitioner] wrote." *Id.* Campbell answered, "Yes," to all three questions. *Id.* Immediately thereafter, the court held a bench conference outside the hearing of the jury. *Id.* at 186-87.

During the bench conference, defense counsel advised the court that the letter "is the same series of questions and suggested answers that was sent to [Petitioner's] attorney by [Petitioner's] mother. She took it from this and then she gave this to [Campbell]. It was never addressed to [Campbell], it was addressed to his lawyer." *Id.* at 187. The prosecutor suggested the letter "could go to two places," and defense counsel reiterated

that it was Petitioner's mother, not Petitioner, who gave the letter to Campbell. *Id.* Following the bench conference, the trial court admitted State's Exhibit 34, over Petitioner's objection. *Id.*

The State later elicited testimony from Petitioner's mother, LaDonna Muir, establishing (1) that Muir recognized the handwriting on State's Exhibit 34 as Petitioner's, (2) that she had previously seen her son's handwriting, (3) that Petitioner gave Muir the letter, and (4) that Petitioner asked Muir to give the handwritten letter to Campbell. Doc. 9-2, Tr. Trial vol. 1, at 217-19. During the prosecutor's examination of Muir, the trial court asked to see State's Exhibit 34 but told the prosecutor to "continue on." *Id.* at 219. Muir further testified that Petitioner contacted her by phone while he was incarcerated and asked her to tell Campbell that "it would just be a misdemeanor" if Campbell "didn't show up" for trial. *Id.* at 219-20. Based on Petitioner's statements, Muir got the impression that Petitioner was trying to dissuade Campbell from testifying at trial. *Id.* at 220.

On cross-examination, Muir testified that Petitioner (1) gave her one typed letter and one handwritten letter, both of which had questions and answers for Campbell from Petitioner, and (2) told her to give the handwritten letter to Campbell and send the typed letter to his attorney. *Id.* at 222-24; *see also* Doc. 9-5, at 8-13 (State's Exhibit 34-handwritten questions and answers for Campbell), *id.* at 14-19 (Defendant's Exhibit 1-typed letter from Muir to attorney and typed questions and answers for Campbell). After defense counsel moved to admit Defendant's Exhibit 1, the trial court inquired whether State's Exhibit 34 had been admitted. Doc. 9-2, Tr. Trial vol. 1, at 224. The prosecutor responded that he was "not sure." *Id.* at 224. At the end of Muir's testimony, the prosecutor

moved for admission of State's Exhibit 34, defense counsel did not object, and the trial court admitted the exhibit. *Id.* at 224-26.

To summarize, the record reflects that the trial judge (1) asked Campbell three foundational questions about State's Exhibit 34, (2) asked to see that same exhibit when the prosecutor examined Muir, and (3) asked if State's Exhibit 34 had been admitted when defense counsel moved to admit a related exhibit. On this record, the Court finds nothing unreasonable about the OCCA's factual determinations or its application of clearly established federal law. Whether viewed individually or collectively, the trial court's actions relating to the admission of State's Exhibit 34 demonstrate good trial management, not actual or apparent judicial bias.

Based on the foregoing, Petitioner cannot make the necessary showings under § 2254(d) to obtain habeas relief on Claim Two.

### C.  Claim Three:  Reasonable Doubt

In his third claim, Petitioner alleges he was deprived of "due process" and "equal protection" because "the trial judge abandoned his role of impartiality when he defined reasonable doubt during voir dire." Doc. 1, at 8; Doc. 10, at 2. Petitioner appeared to raise a broader claim on direct appeal. There, he additionally argued that the trial judge committed misconduct when he improperly "informed the prospective jurors that defense counsel would try to ask them a 'trick' question, and suggested that the jury could self-determine that the evidence supported conviction once any evidence had been admitted at trial." Doc. 8-3, OCCA Op., at 5. Even liberally construed, the petition and reply appear to focus only on the allegation that the trial judge improperly defined reasonable doubt

26

during voir dire.  Doc. 1, at 8; Doc. 10, at 2.  Out of an abundance of caution, the Court will consider the OCCA's ruling on the broader claim.

Applying plain-error review, the OCCA rejected Petitioner's claim.  Doc. 8-3, OCCA Op., at 5-7.  First, the OCCA found that rather than defining "reasonable doubt" the trial court "properly sought to dispel commonly held attitudes and ascertain whether the prospective jurors would follow the trial court's instructions on the law by contrasting 'reasonable doubt' with the concept of 'any doubt.'"  *Id.* at 5-6.  Second, the OCCA found no record support for Petitioner's allegations that the trial court either (1) told prospective jurors that defense counsel would ask a "trick question" about reasonable doubt or (2) suggested the jury could "self-determine" the sufficiency of the evidence once "any evidence had been admitted at trial."  *Id.* at 6.  Thus, the OCCA found no actual or plain error based on alleged judicial misconduct during voir dire.  *Id.* at 7.

Petitioner contends the OCCA's decision on this claim "is clearly contrary to state and federal law and was clearly based on a[n] unreasonable determination of the facts."  Doc. 1, at 8.  Petitioner fails to identify any clearly established federal law governing this claim.  However, to the extent Petitioner alleges a due process violation, § 2254(d) bars relief.  As presented to the OCCA, Petitioner complained of the following comment by the trial judge on the concept of reasonable-doubt:

> To the best of my knowledge, reasonable doubt is the only words in the millions of words that lawyers use that we're not allowed to explain.  Those who make the laws say reasonable doubt is what each juror thinks reasonable doubt is.  Okay.  In other words, they say, I bet it would be impossible for a judge or lawyer to define reasonable doubt and give you a better understanding of it than that which you have in your heart and in your mind.  *I can tell you and they will tell you, that doesn't mean any doubt.  The doubt*

27

*has to be reasonable, but beyond that we can't define it.*

Doc. 8-1, Pet'r App. Br., at 28 (emphasis in original). By applying its plain-error test to review Petitioner's claim that this comment deprived him of a fair trial, the OCCA identified and applied the correct legal principle for analyzing a due process claim. *See Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015) ("Oklahoma's formulation of the plain-error standard is virtually identical to the constitutional test for due process."). As a result, this Court must defer to the OCCA's decision unless Petitioner demonstrates that the OCCA's application of the federal due process test was objectively unreasonable. *White*, 572 U.S. at 419; *see also Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005) ("Because the OCCA applied the same test we apply to determine whether there has been a due-process violation, we must defer to its ruling unless it 'unreasonably appli[ed]' that test" (alteration in original) (quoting 28 U.S.C. § 2254(d))).

Having reviewed the record, the Court finds nothing objectively unreasonable about the OCCA's adjudication of Petitioner's due process claim. As the OCCA reasoned, taken in context of the entire trial, the trial court's comments on reasonable doubt during voir dire, even if inartful, were not so egregious that they deprived Petitioner of a fair trial. Doc. 8-3, OCCA Op., at 5-6; *see Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (explaining that the overriding question in a fundamental-fairness analysis is whether erroneously admitted evidence or improper comments "so infused the trial with unfairness as to deny due process of law"). Moreover, as the OCCA found, the trial court gave multiple instructions that properly instructed the jury as to the government's burden of proof. Doc. 8-3, OCCA Op., at 6; *see* Doc. 9-8, Orig. Rec., at 92, 99, 109, 120, 123, 126 (opening and closing

instructions referring to reasonable doubt standard; elements instructions referring to State's burden).

Finally, the OCCA reasonably rejected Petitioner's additional allegations of judicial misconduct during voir dire because it found no record support for these allegations. Doc. 8-3, OCCA Op., at 6. The record supports the OCCA's decision. The record reflects that the trial court explained to prospective jurors that the State must prove each element of each crime beyond a reasonable doubt. Doc. 9-2, Tr. Trial vol. 1, at 29. The trial court then said,

> The question which is often asked, and I'm gonna spare you all a trick question so you'll know the answer, they sometimes say, "Well, if you had to rule right now, how would you decide?" The answer to that is you would find for the defendant because you haven't had any evidence that shows you beyond a reasonable doubt that the defendant is guilty of each element of the crime. So you understand why that's important and what that means.

*Id.* On direct appeal, Petitioner relied on this passage to argue both (1) that the trial judge warned the jurors that defense counsel would ask a trick question and (2) that the trial court suggested that the jury could "self-determine" his guilt once any evidence was presented. Doc. 8-1, Pet'r App. Br., 27-28. Like the OCCA, this Court does not read this passage to support either argument. Thus, contrary to Petitioner's assertion, the OCCA's decision is based on a reasonable determination of the facts in light of the evidence presented in the state-court proceeding.

Based on the foregoing, Petitioner cannot satisfy § 2254(d)'s standards as to this claim. The Court therefore denies habeas relief on Claim Three.

### D.    Claim Four:  Prosecutorial Misconduct

Next, Petitioner claims prosecutorial misconduct deprived him of a fair trial. Doc. 1, at 10. He alleges that the prosecutor (1) improperly "vouch[ed] for the integrity of law enforcement and the prosecutors during voir dire" by suggesting the State only arrests and prosecutes people who are guilty, and (2) failed to correct the false testimony of a key State witness, Caleb Wayne Bush, when Bush testified falsely about his criminal history. *Id.*; Doc. 10, at 3.

The OCCA reviewed Petitioner's prosecutorial misconduct claim for plain error and rejected both aspects of his claim. Doc. 8-3, OCCA Op., at 7-8. First, the OCCA found that the prosecutor's questions to a prospective juror who was a retired law enforcement officer "were borderline statements." *Id.* at 7. The OCCA concluded, however, that those statements "were too oblique to be interpreted as an overt suggestion that the State only files charges against guilty people or a personal opinion concerning [Petitioner's] guilt." *Id.* at 7. Second, the OCCA found "[n]othing in the record on appeal [to] suggest[] either that Bush's testimony was untruthful or that the prosecution deliberately deceived the court and the jurors with the presentation of known false evidence." *Id.* at 8. The OCCA emphasized that Petitioner attempted to support this part of his claim by referring the OCCA to "[s]ee the online dockets available," rather than by properly including the "online dockets" in the appellate record as required by state procedural rules. *Id.* The OCCA further stated, "As Bush's reliability was not determinative of [Petitioner's] guilt or innocence, we find that [Petitioner] has not shown the existence of actual error." *Id.* Thus, the OCCA found no actual or plain error as to Petitioner's prosecutorial misconduct claim. *Id.* at 7-8.

Petitioner asserts that "[t]he OCCA's ruling on this [claim] is clearly flawed," "clearly contrary to state and federal law and based on a[n] unreasonable determination of the facts." Doc. 1, at 10. The Court disagrees and finds that § 2254(d) bars habeas relief as to both aspects of this claim.

### 1. Vouching for prosecution

In the first part of Claim Four, Petitioner alleges that "the prosecutor used voir dire to establish the premise that [Petitioner] was being prosecuted because he was guilty." Doc. 1, at 10. As he did in state court, he cites the following questions the prosecutor posed to a prospective juror who identified himself as a former law enforcement officer:

- "It is one of the jobs of law enforcement and the District Attorneys to hold guilty people accountable. True or false?"

- "Would you also agree with me that probably a more—under our system, a more important job of law enforcement and the district attorney is not to accuse innocent people of crimes?"

- "That's why we do full investigations; correct?"

Doc. 8-1, Pet'r App. Br., at 32-34; *see* Doc. 9-2, Tr. Trial vol. 1, at 61-62.

Generally, to obtain federal habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the prosecutor's alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Neill v. Gibson*, 278 F.3d 1044, 1061 (10th Cir. 2001) (noting that, "to warrant habeas relief, 'it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to'"

deny due process (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986))). To determine whether prosecutorial misconduct rendered a trial unfair, a reviewing court must evaluate the prosecutor's conduct in the context of the entire trial and consider "the strength of the evidence against the petitioner." *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2009).

By reviewing Petitioner's claim for plain error, the OCCA identified and applied the correct legal principle—namely, the federal due process standard. *See DeChristoforo*, 416 U.S. at 643; *Hancock*, 798 F.3d at 1011. As stated, the OCCA found the prosecutor's questions to be "borderline statements" but not improper. Doc. 8-3, OCCA Op., at 7. Petitioner fails to show that the OCCA's decision is either contrary to or an unreasonable application of clearly established federal law. *See Wood*, 907 F.3d at 1289 ("A state-court decision is only contrary to clearly established federal law if it 'arrives at a conclusion opposite to that reached by' the Supreme Court, or 'decides a case differently' than the Supreme Court on a 'set of materially indistinguishable facts.'" (quoting *Terry Williams*, 529 U.S. at 412-13)). Likewise, he fails to demonstrate that the decision rests on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. Thus, § 2254(d) bars relief as to the first part of Claim Four.

### 2. *Napue* claim

As to the second part of his claim, Petitioner alleges, as he did in state court, (1) that Caleb Wayne Bush lied about his criminal history, and (2) the prosecutor "let [Bush] testify falsly [sic] about his criminal past so as to 'Fluff up' his credibility." Doc. 1, at 10; Doc. 10, at 3. He further contends the OCCA's ruling rejecting this part of Claim Four "is clearly

in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and contrary to that ruling and *United States v. Bagley*, 473 U.S. 667 (1985)." Doc. 10, at 3.

The record reflects that Bush testified, on direct examination, that he had no prior convictions for felonies or for "misdemeanor[s] involving moral turpitude." Doc. 9-2, Tr. Trial vol. 1, at 164-65. The prosecutor then stated, "Okay. This is your first brush with the law?" *Id.* at 165. Bush responded, "It is." *Id.*

Petitioner contends that Bush lied when he said his involvement in this case was his "first brush with the law," because, at the time of trial, Bush had two misdemeanor DUI convictions out of Kay County, Oklahoma. Doc. 1, at 10; Doc. 10, at 3; Doc. 8-1, at 35-38. Thus, he argues, the prosecutor committed misconduct by failing to correct Bush's false testimony. Doc. 1, at 10. In addition, he contends the OCCA erred in determining Bush's "reliability was not determinative" because "Bush is the only person" who testified that he saw Petitioner inside the Moore's home. Doc. 10, at 3.

In *Napue*, the Supreme Court "held that the Due Process Clause would be violated if the prosecutor knowingly failed to correct perjured testimony in its case, even when the evidence went only to the credibility of the witness." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). *Garcia* explained that "[a] *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *Id.* The first two showings necessary to establish a *Napue* violation require a reviewing court to make factual findings. *Id.* The third showing requires the reviewing court to apply a harmless-error test; specifically, "[t]he false testimony is material 'unless failure to disclose [the perjury] would be harmless

33

beyond a reasonable doubt.'" *Id.* (quoting *Bagley*, 473 U.S. at 680). The OCCA recognized Petitioner's arguments as asserting a *Napue* claim and found "nothing in the record on appeal" to support Petitioner's allegations (1) that Bush lied about his criminal history or (2) "that the prosecution deliberately deceived the court and the jurors with the presentation of known false evidence." Doc. 8-3, OCCA Op., at 8. And, in stating Bush's "reliability was not determinative of [Petitioner's] guilt," the OCCA effectively determined the failure to disclose the alleged perjury was harmless. *Id.* In other words, the OCCA found that Petitioner failed to establish any of the necessary elements of his *Napue* claim.

On the record presented, this Court cannot find that the OCCA's decision is either contrary to *Napue*, an objectively unreasonable application of *Napue*, or based on an unreasonable determination of the facts. Significantly, the OCCA declined to consider Petitioner's references, in a footnote of his state appeal brief, to "online dockets" supporting his claim that Bush, at the time of trial, had two criminal DUI misdemeanors in Kay County, Oklahoma. *Id.* The OCCA stated that Petitioner failed to the comply with state procedural rules to make the "online dockets" part of the appellate record. *Id.* In reviewing a habeas claim under § 2254(d), this Court must review the state court's decision in light of the evidence that was presented in the state court proceeding. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); 28 U.S.C. § 2254(d)(2). Moreover, even assuming the OCCA should have considered the "online dockets" supporting Petitioner's allegations about Bush's prior criminal history, that information would have been sufficient only to support the first element of Petitioner's *Napue* claim, *i.e.*, that Bush lied. Thus, there would still be a reasonable basis for the OCCA to conclude that Petitioner failed to establish a

34

*Napue* violation under the facts of this case. For these reasons, the Court denies habeas relief as to the second part of Claim Four.

### E.     Claim Six:  Cumulative Error

In his sixth claim, Petitioner alleges the cumulative effect of the trial errors alleged in Claims One through Five deprived him of a fair trial.  Doc. 1, at 13.  Finding no errors to accumulate, the OCCA rejected this claim.  Doc. 8-3, OCCA Op., at 9-10.

Petitioner contends the OCCA's ruling is "clearly flawed," "clearly contrary to state and federal law and based on a[n] unreasonable determination of the facts," and "clearly wrong."  Doc. 1, at 13; Doc. 10, at 4.  The Court disagrees.[22]  "[I]n the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."  *Alverson v. Workman*, 595 F.3d 1142, 1162 (10th Cir. 2010) (internal quotation marks and brackets omitted).  A cumulative-error analysis is warranted "only if there are at least two errors."  *Lott v. Trammell*, 705 F.3d 1167, 1223 (10th Cir. 2013) (quoting *Hooks v. Workman*, 689 F.3d 1148, 1194-95 (10th Cir. 2012)).

Like the OCCA, the Court finds no harmless constitutional errors and thus, no errors to consider in the aggregate.  The Court therefore denies habeas relief on Claim Six.

---

[22] Respondent argues this claim "must fail for lack of clearly established federal law."  Doc. 8, at 34.  But Tenth Circuit "precedent forecloses this argument."  *Cuesta-Rodriguez v. Carpenter*, 2019 WL 847571, at *23 n.33 (10th Cir. Feb. 22, 2019); *Smith*, 824 F.3d at 1255; *Cole v. Trammell*, 755 F.3d 1142, 1177 n.14 (10th Cir. 2014); *Darks v. Mullin*, 327 F.3d 1001, 1017-18 (10th Cir. 2003).

**F.      Claims Seven and Eight:  Ineffective Assistance of Counsel**

In Claims Seven and Eight, Petitioner alleges he was deprived of his Sixth Amendment right to the effective assistance of counsel at trial and on direct appeal.  Doc. 1, at 14-15; Doc. 10, at 4-5.  As he did in state court, Petitioner alleges that trial counsel was ineffective for (1) failing to preserve the errors alleged in Claims One through Five for appellate review and (2) refusing to permit Petitioner to testify at trial.  Doc. 1, at 14. Petitioner alleges that appellate counsel was ineffective for (1) failing to adequately present Claim Three, (2) failing to prepare an adequate appellate record to support the second part of Claim Four (the *Napue* claim), and (3) failing to argue trial counsel was ineffective for refusing to permit Petitioner to testify.  *Id.* at 15.

Petitioner presented these claims to the OCCA through his postconviction appeal. Applying *Smith v. Robbins*, 528 U.S. 259, 289 (2000), and *Strickland v. Washington*, 466 U.S. 668 (1984), the OCCA rejected both claims.  Doc. 8-8, OCCA PC Order, at 2-5.  First, the OCCA agreed with the state district court's determination that trial counsel was not ineffective for failing to preserve the errors alleged Claims One through Five.  *Id.* at 2-3. Next, the OCCA agreed with the state district court's determination that Petitioner's testimony at the postconviction evidentiary hearing did not support his claim that trial counsel barred him from testifying at trial.  *Id.*  Thus, the OCCA concluded, trial counsel also was not ineffective in that respect.  *Id.*  Finally, as to his ineffective-assistance-of-appellate-counsel claim, the OCCA stated that it "examined [Petitioner's] claims of ineffective assistance of counsel, based on appellate counsel's failure to adequately raise these claims" and found that Petitioner "failed to establish that appellate counsel's

performance was deficient or objectively unreasonable" and "failed to establish any resulting prejudice." *Id.* at 4-5.

Petitioner contends the OCCA's decision as to both Sixth Amendment claims is "contrary to state and federal law and based on a[n] unreasonable determination of the facts." Doc. 1, at 14-15. He specifically contends the decision is contrary to *Strickland* and *Mickens v. Taylor*, 535 U.S. 162 (2002). Doc. 10, at 4-5. The Court finds that Petitioner cannot overcome § 2254(d) as to either of his ineffective-assistance-of-counsel claims. The Sixth Amendment provides criminal defendants with the right to the effective assistance of trial and appellate counsel. U.S. Const. amend. VI; *Robbins*, 528 U.S. at 289; *Strickland*, 466 U.S. at 688, 692. To establish a Sixth Amendment violation, a petitioner must show (1) deficient performance and (2) resulting prejudice. *Robbins*, 528 U.S. at 288-89; *Strickland*, 466 U.S. at 692. "[T]he performance inquiry necessarily turns on 'whether counsel's assistance was reasonable considering all the circumstances.'" *Wong v. Belmontes*, 558 U.S. 15, 17 (2009) (quoting *Strickland*, 466 U.S. at 688-89). The reasonableness standard is "highly deferential." *Strickland*, 466 U.S. at 689. And, in determining whether prejudice ensued, the reviewing court must determine whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The AEDPA adds an additional layer of deference to *Strickland*'s "highly

deferential" standard. *See Pinholster*, 563 U.S. at 190 (discussing the "doubly deferential" standard that applies when habeas court reviews state court's adjudication of *Strickland* claim); *Richter*, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Because the OCCA applied *Strickland* and *Robbins*, Petitioner must overcome § 2254(d)'s bar to habeas relief by showing either (1) that the OCCA's application of *Strickland* and *Robbins* to the facts of his case was objectively unreasonable or (2) that its decision was based on an unreasonable determination of the facts. *Pinholster*, 563 U.S. at 182; 28 U.S.C. § 2254(d). Petitioner fails to make either showing.

### 1. Ineffective assistance of trial counsel

Petitioner contends trial counsel was ineffective in two respects. First, he contends trial counsel performed deficiently by failing to contemporaneously object to the trial errors alleged in Claims One through Five.[23] Doc. 1, at 14; Doc. 10, at 4-5. This deficient performance, he argues, resulted in prejudice because it caused the OCCA to review the alleged trial errors only for plain error. *Id.*

---

[23] Respondent contends that the OCCA imposed a procedural bar to reject Petitioner's claim that trial counsel was ineffective for failing to preserve the errors alleged in Claims One through Five. Doc. 8, at 37-44. As further discussed below, the Court reads the OCCA's decision differently than Respondent. Regardless of which reading is correct, the Court declines to address Respondent's procedural bar argument because, as further discussed below, Petitioner's claims are readily disposed of on the merits. *See Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2004) ("When questions of procedural bar are problematic, however, and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits.").

Though not entirely clear, it appears that in rejecting this portion of Claim Seven, the OCCA adopted the state district court's reasoning that because the OCCA found no "actual errors" on direct appeal with respect to Claims One through Five, Petitioner could not show that trial counsel performed deficiently by failing to object to the alleged errors at trial. Doc. 8-3, OCCA Op., at 2-3; *see* Doc. 8-6, Final PC Findings, at 7-8 (noting that the first prong of the plain-error test applied by the OCCA on direct appeal required a finding of "an actual error," finding that "the [OCCA] found no error and thus there was nothing for counsel to have objected," finding "there could not have been inadequate representation by counsel based upon the failure to raise non-existent error," and concluding "Defendant failed to show that, as to the first five issues raised in the appellate brief, that there was any error and that counsel was not ineffective because she failed to object"). Petitioner fails to argue, let alone demonstrate, that the OCCA's decision on this point was objectively unreasonable. *See, e.g.*, *Hawkins v. Hannigan*, 185 F.3d 1146, 1158 (10th Cir. 1999) (concluding trial counsel was not ineffective for failing to object to admission of evidence when evidentiary claim lacked merit).

Moreover, even assuming trial counsel performed deficiently by failing to properly preserve the errors alleged in Claims One through Five, it would have been reasonable for the OCCA to determine that Petitioner failed to show resulting prejudice. As discussed, the OCCA reviewed Claims One through Five under its plain-error test, but found no "actual error" as to any claim. Doc. 8-3, OCCA Op., at 2-9. Thus, regardless of whether trial counsel's allegedly deficient performance resulted in the OCCA applying "[a] higher bar of review" on appeal, *see* Doc. 1, at 14, Petitioner cannot demonstrate a "reasonable

probability" that, but for trial counsel's failure to properly preserve these errors for appellate review, the result of the proceeding (*i.e.*, his direct appeal), would have been different.  *Strickland*, 466 U.S. at 688, 694.  As a result, it was objectively reasonable for the OCCA to find no Sixth Amendment violation as to the first portion of Claim Seven.

Second, Petitioner contends trial counsel was ineffective for refusing to allow Petitioner to testify at trial.  Doc. 1, at 14.  But the OCCA had an objectively reasonable basis, in both law and fact, for rejecting this part of Claim Seven.  Following an evidentiary hearing, the state district court found "credible, clear and convincing" trial counsel's testimony that she advised Petitioner not to testify, advised him "of his right against self-incrimination and his power to waive that right," but "left the decision up to" Petitioner as to whether he would testify at trial.  Doc. 8-6, Final PC Findings, at 7.  The state district court's finding is amply supported by the transcript from the evidentiary hearing.  Doc. 9-7, Tr. PC Hr'g, at 5-6.  In rejecting Petitioner's claim that trial counsel barred him from testifying, the OCCA adopted this factual finding and agreed with the state district court that Petitioner's claim was "without merit."  Doc. 8-8, OCCA PC Order, at 2-3.  Petitioner's conclusory assertion in his petition that "[t]rial counsel would not let [him] testify," Doc. 1, at 14, is wholly insufficient in light of the state court record and the rebuttable presumption of correctness that adheres to the state court's factual finding on this point.  28 U.S.C. § 2254(e)(1).  Thus, the second portion of Claim Seven also fails to support Petitioner's request for habeas relief.

### 2.      Ineffective assistance of appellate counsel

In Claim Eight, Petitioner contends appellate counsel was ineffective in three

respects: appellate counsel (1) "failed to properly lay out proposition 3 on direct appeal,"[24]

(2) "failed to expand the record properly and attach State's witness Caleb Bush's online

docket sheet to support Petitioner's direct appeal, Part 2 of proposition four, prosecutorial

misconduct claim," and (3) "failed to address the fact that Petitioner wanted to testify in

his own defense and trial counsel would not let him." Doc. 1, at 15. On postconviction

appeal, the OCCA determined that Petitioner "failed to establish that appellate counsel's

performance was deficient or objectively unreasonable" and "failed to establish any

resulting prejudice." Doc. 8-8, OCCA PC Order, at 4. Despite the OCCA's cursory

treatment of Claim Eight, Petitioner still bears the burden to show that "there was no

reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Petitioner fails

to make this showing.

In determining whether appellate counsel was ineffective for failing to raise an issue

on appeal, the reviewing court generally must "look to the merits of the omitted issue."

*Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (quoting *Neill*, 278 F.3d at 1057).

Significantly, "if the issue is meritless, its omission will not constitute deficient

performance." *Id.* However, Petitioner does not complain that appellate counsel omitted

meritorious issues, rather, he alleges counsel performed deficiently by failing to adequately

---

[24] Petitioner does not further develop this argument in his petition or reply. In his application for postconviction relief, Petitioner supported this allegation of ineffectiveness by directing the state district court to consider footnote 3 of the OCCA's opinion affirming his convictions and sentences. *See* Doc. 8-4, at 6. On review of that footnote, it appears the gist of Petitioner's complaint is that appellate counsel provided ineffective assistance by waiving appellate review of a claim that trial counsel was ineffective for failing to object to the trial error alleged in Claim Three—the trial court's comments on reasonable doubt. *See* Doc. 8-3, OCCA Op., at 7 n.3.

present three issues that were raised on appeal.  Doc. 1, at 15.  As previously discussed, the

OCCA found no "actual errors" with respect to the trial errors alleged in Claims One

through Five.  Doc. 8-3, OCCA Op., at 2-9.  As a result, it was objectively reasonable for

the OCCA to further conclude that Petitioner failed to show a "reasonable probability that

appellate counsel would have prevailed on direct appeal had he argued trial counsel was

deficient and that these enumerated errors resulted in prejudice."  Doc. 8-8, OCCA PC

Order, at 4.  Thus, § 2254(d) bars habeas relief on Claim Eight.

## CONCLUSION

Based on the foregoing analysis, the Court concludes that petitioner is not entitled

to federal habeas relief on any of the claims he presents in his habeas petition.  The Court

therefore denies his petition for a writ of habeas corpus.

### Certificate of Appealability

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*,

requires a district court to "issue or deny a certificate of appealability when it enters a final

order adverse to the [petitioner]."  The court may issue a certificate of appealability "only

if the [petitioner] has made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2).  When the court rejects a petitioner's constitutional claims on the

merits, the petitioner must make this showing by demonstrating "that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong."

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Because the Court finds that reasonable

jurists would not debate the correctness of its assessment of petitioner's constitutional

claims, the Court declines to issue a certificate of appealability as to any claims raised in

the habeas petition.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.    The petition for a writ of habeas corpus (Doc. 1) is **denied**.

2.    A certificate of appealability is **denied**.

3.    A separate judgment shall be entered in this case.

ORDERED this 18th day of March 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT